942 F.2d 1427
 33 ERC 1693, 60 USLW 2181, 22 Envtl.
L. Rep. 20,007
 BOISE CASCADE CORPORATION; Pope & Talbot, Inc.; James
River II, Inc., Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
NORTHWEST COALITION FOR ALTERNATIVES TO PESTICIDES (NCAP), Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
CITIZENS FOR A BETTER ENVIRONMENT, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
The Santa Clara Valley Nonpoint Source Dischargers,
Respondent-Intervenor.
NORTHWEST COALITION FOR ALTERNATIVES, et al., Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 89-70428, 89-70429, 89-70430, 90-70494, 90-70496,
90-70497, 90-70262, 91-70056 and 91-70426.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 2, 1991.
Decided Aug. 23, 1991.
As Amended Oct. 7, 1991.
 
 Nora Chorover, Citizens for a Better Environment, San Francisco, Cal., Richard H. Williams, Lane, Powell, Spears, Lubersky, Jay T. Waldron and David F. Bartz, Jr., Schwabe, Williamson, Wyatt, Portland, Oregon; Victor Sher, Sierra Club Legal Defense Fund, Seattle, Wash. and John E. Bonine, Eugene, Or., for petitioners.
 Marilyn Jacobsen and Martin F. McDermott, U.S. Dept. of Justice, and Diane Regas, E.P.A., Washington, D.C., for respondent.
 Robert L. Falk, Morrison & Foerster, San Francisco, Cal., for intervenor.
 Petition for Review of a Decision of the Environmental Protection Agency.
 Before WRIGHT, BEEZER and WIGGINS, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 This is a consolidated disposition concerning two related petitions brought pursuant to the Clean Water Act (Act). California and Oregon each submitted to the United States Environmental Protection Agency (EPA) an individual control strategy (ICS) intended to address the discharge of toxic pollutants into water segments within its respective state. The EPA approved the ICSs and these petitions followed.
 
 
 2
 Citizens for a Better Environment (Citizens) petitions for review of the California ICS. The Santa Clara Valley Nonpoint Source Dischargers (Municipalities), a consortium of municipalities whose stormdrains were the identified cause of the discharge, petitioned to intervene.[1] The Oregon ICS is being challenged by three pulp and paper mills affected by that ICS,[2] and by the Northwest Coalition for Alternatives to Pesticides (the Coalition).[3] We dismiss both petitions for lack of jurisdiction.
 
 
 3
 * The Clean Water Act, 33 U.S.C. § 1251 et seq., is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. One of the policies of the Act is to "recognize, preserve, and protect the primary responsibilities and rights of States" in the restoration and maintenance of their waters and in the application of the Act. See 33 U.S.C. § 1251(b).[4] This policy is evident in the requirement, added by the Water Quality Act of 1987, that states identify navigable waters affected by toxic pollutants and develop strategies for cleaning them.
 
 
 4
 Section 304(l ) of the Act requires each state to list all navigable waters for which the state does not expect to be able to achieve applicable water quality standards (the "A list"). § 304(l )(1)(A), 33 U.S.C. § 1314(l )(1)(A). States are to submit another list (the "B list") of waters for which the anticipated failure to achieve the relevant standard is due to the discharge of certain toxic pollutants identified in section 1317(a). See id. § 1314(l )(1)(B). States must also identify the point sources responsible for the problem (the "C list"). Id. § 1314(l )(1)(C).[5] For each point source listed, the state must devise an "individual control strategy" (ICS) calculated to bring about compliance with the water quality standards within three years of the adoption of the ICS. Id. § 1314(l )(1)(D).
 
 
 5
 The EPA must approve or disapprove a state's ICS within a specified period of time. See 33 U.S.C. § 1314(l )(2). If a state fails to submit lists or ICSs, or if EPA disapproves an ICS, the EPA "in cooperation with such State ... shall implement the requirements of paragraph (1) in such States." Id. § 1314(l )(3). See generally Westvaco Corp. v. EPA, 899 F.2d 1383, 1385 (4th Cir.1990).
 
 
 6
 EPA regulations state that an ICS is to be submitted in the form of a final National Pollutant Discharge Elimination System (NPDES) permit. 40 C.F.R. § 123.46(c).[6] Unlike an ICS, which is a plan to limit discharge of toxic pollutants, an NPDES permit allows what would otherwise be an illegal discharge of pollutants from a point source or point sources[7] into navigable waters and ensures that such discharge will comply with the requirements of the Act. See 33 U.S.C. §§ 1311(a), 1342(a). The permits are issued pursuant to a system established in section 402 of the Act, 33 U.S.C. § 1342. Because of the relationship between ICSs and NPDES permits, analysis of ICSs requires references to NPDES permits and must rely in part on interpretation of NPDES statutes and regulations.
 
 
 7
 The federal-state relationship established by the Act is also illustrated in Congress' goal of encouraging states to "assume the major role in the operation of the NPDES program." Shell Oil Co. v. Train, 585 F.2d 408, 410 (9th Cir.1978); see also American Paper Institute, Inc. v. EPA, 890 F.2d 869, 873 & n. 6 (7th Cir.1989). The Administrator of the EPA is authorized to delegate to individual states the authority to issue NPDES permits themselves, subject to EPA objection. See 33 U.S.C. § 1342(b), (d).
 
 
 8
 When a state has been granted such authority, the EPA must suspend its own authority to issue permits until the Administrator determines that the state is no longer capable of issuing permits and notifies the state that the state's authority to do so is being withdrawn. Id. § 1342(c). The result is "a system for mandatory approval of a conforming State program [which] creates a separate and independent State authority to administer the NPDES pollution control." Shell Oil, 585 F.2d at 410 (quoting Mianus River Preservation Committee v. EPA, 541 F.2d 899, 905 (2d Cir.1976)).
 
 
 9
 California and Oregon are two of 39 states that have been granted authority to administer NPDES programs themselves. See 39 Fed.Reg. 26,061 (1973) (cited in Shell Oil, 585 F.2d at 410). The California State Water Resources Control Board (State Board) and its various Regional Water Quality Control Boards are responsible for the enforcement of the Act in California and for issuing NPDES permits. Jurisdiction to review decisions of the California State Board is conferred on California state courts. Cal. Water Code § 13330. The state agency that issues NPDES permits in Oregon is the Oregon Department of Environmental Quality. Jurisdiction to review decisions of the Oregon Department of Environmental Quality is conferred on Oregon state courts. Or.Rev.Stat. § 183.484 (1991).
 
 II
 A. California Factual Background
 
 10
 California submitted the section 1314(l ) lists to the EPA in February 1989. The South San Francisco Bay was included on the B-list of water segments impaired by the discharge of section 1317(a) toxic pollutants. Area storm drains were identified as point sources contributing to violations of water quality standards. EPA approved the listing decisions, but found that California had missed the February 1989 deadline for submitting an ICS for the storm drain discharges into the South San Francisco Bay. The EPA decision stated:
 
 
 11
 EPA is not able to approve the stormwater ICSs at this time because none have been submitted. However, EPA acknowledges that while the State is currently taking steps toward development of stormwater permits, it is not reasonable to expect a completed ICS at this time. Recent completion of field monitoring of the South Bay stormdrains and the scheduled completion of a report characterizing the storm discharges should enable the State to develop stormwater permits. If the State completes stormdrain ICSs by March 1990, EPA will consider those ICSs for approval as part of EPA's final 304(1) decisions. EPA is committed to working cooperatively with the State in developing the stormwater permits.
 
 
 12
 On June 20, 1990, the California Regional Water Quality Control Board, San Francisco Bay Region, issued a final NPDES permit to the Municipalities. The permit prohibited stormwater discharge that would "cause a violation of any applicable water quality objectives for receiving waters" and required the Municipalities to comply with a number of management practices designed to identify the sources of pollutants in stormwater discharge and to decrease their presence. California submitted the NPDES permit to the EPA as an ICS for the storm drains. On September 28, 1990, EPA's Region IX office approved the NPDES permit as an ICS.
 
 
 13
 Citizens objected to the permit on the ground that it did not contain numerical effluent limitations for stormdrain discharge. On July 23, 1990, Citizens filed an administrative petition for review with the California State Board challenging the NPDES permit on the ground that it lacked numerical water quality-based effluent limitations. On May 16, 1991, the State Board declined to require the NPDES permit to include numerical water quality-based effluent limits. On January 25, 1991, Citizens petitioned this court for review of the EPA's approval of California's ICS.
 
 B. Oregon Factual Background
 
 14
 In February 1989, Oregon submitted its lists of navigable waters requiring ICSs. EPA responded by informing the Oregon Department of Environmental Quality that detectable levels of 2,3,7,8 tetrachlorodibenzo-p-dioxin had been connected to the presence of chlorine bleaching pulp and paper mills, and that the lists submitted by Oregon should be modified to include the mills petitioning for review in this case.
 
 
 15
 In June 1989, Oregon submitted amended lists and ICSs for the three mills in the form of preliminary draft permit modifications. EPA conditionally approved the ICSs with final approval contingent upon issuance of final permits containing effluent limitations on the chlorine-based toxin. From December 1989 to November 1990, the Oregon Department of Environmental Quality held hearings and submitted a number of draft permits and proposed final permits with schedules and effluent limitations for EPA approval. During this period, the Mills and the Coalition petitioned to this court for review of the EPA's conditional approval of the ICSs.
 
 
 16
 In January 1991, this court granted EPA's motion for a voluntary remand to allow EPA to reconsider the question of approval of the ICSs and to consider whether there had been adequate opportunity for public comment at the state or federal level. On March 27, 1991, EPA approved the state-submitted permits as ICSs for the Boise Cascade and James River mills, and conditionally approved the ICS concerning Pope & Talbot.
 
 
 17
 The Boise Cascade and James River mills have filed administrative appeals with the Oregon Department of Environmental Quality contesting the final, November 1990, state-submitted permit renewals. The Coalition is a party to that consolidated appeal. The Coalition has also filed an action in Oregon circuit and appeals courts contesting the permit modification issued for the Pope & Talbot mill.
 
 III
 33 U.S.C. § 1369(b)(1) provides:
 
 18
 Review of the Administrator's action ... (G) in promulgating any individual control strategy under section 1314(1) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person.
 
 
 19
 The EPA argues that this court does not have jurisdiction to review its approval of the California and Oregon ICSs because such approval does not constitute "promulgation."
 
 
 20
 Section 1369(b)(1) specifically grants courts of appeals jurisdiction to review only certain EPA actions taken with respect to each of the requirements of the Act.[8] The section distinguishes between EPA approvals, determinations and promulgations. Such specificity demonstrates that Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act. See Bethlehem Steel Corp. v. EPA, 538 F.2d 513, 517 (2d Cir.1976) ("[T]he complexity and specificity of section [1369(b)(1) ] in identifying what actions of EPA under the [Clean Water Act] would be reviewable in the courts of appeals suggests that not all such actions are so reviewable.").
 
 
 21
 Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous. See Sutherland Stat. Const. §§ 46.05, 46.06 (4th ed.1984); see also Aluminum Co. of America v. Bonneville Power Admin., 891 F.2d 748, 755 (9th Cir.1989). We must presume that words used more than once in the same statute have the same meaning. See Sutherland § 46.06.
 
 
 22
 We hold that for the purposes of section 1369(b)(1), "promulgation" is not the same as "approval." The difference between subsection (G) and subsection (E), which provides for review of EPA decisions "approving or promulgating" effluent limitations, 33 U.S.C. § 1369(b)(1)(E), compels this conclusion. See United Technologies Corp. v. OSHA, 836 F.2d 52, 53 (2d Cir.1987) (The use of different words in the same sentence of a statute signals that Congress intended to distinguish between them.). To fail to distinguish between "promulgation" and "approval" would either result in a conflict between subsections (E) and (G) or would make superfluous the use of "approval" in subsection (E). We conclude, therefore, that Congress did not consider EPA approval of ICSs to be "promulgation" for the purpose of judicial review pursuant to subsection (G).
 
 
 23
 The Seventh Circuit reached the same conclusion in Roll Coater, Inc. v. Reilly, 932 F.2d 668 (7th Cir.1991), in which the court held that the EPA's approval of an ICS is not reviewable under section 1369(b)(1)(G).
 
 
 24
 Subsection (E) authorizes review of a decision "approving or promulgating any effluent limitation" under certain sections, the very distinction the EPA asks us to draw under subsection (G). Other subsections reinforce this reading. Subsections (B) and (D) create jurisdiction to review "any determination pursuant to" a named statute. Three more subsections--(A) and (C), in addition to (G)--limit review to the EPA's action in "promulgating" something. Subsection (A) refers to a "standard of performance" under § 306, 33 U.S.C. § 1316, and subsection (C) to an "effluent standard, prohibition, or pretreatment standard" under § 307, 33 U.S.C. § 1317. All of the items in (A) and (C) are things the Administrator does on his own. Subsections (B) and (D) treat "determinations" as something different from promulgation, implying that the EPA does not "promulgate" everything it issues or approves.
 
 
 25
 Id. at 670.
 
 
 26
 The petitioners argue that Roll Coater is different from the present cases because the ICS approved in Roll Coater was in the form of a draft NPDES permit, which the EPA could approve only conditionally. See 40 C.F.R. § 123.46(f). Because the state could modify the permit subsequent to the EPA's conditional approval, see Roll Coater, 932 F.2d at 669, the approval was not a final determination regarding the permit and for that reason review was not appropriate.
 
 
 27
 The Roll Coater court stated that "[u]ntil the state amends Roll Coater's permit to incorporate the terms of the ICS, there is no review anywhere." Id. at 671. The court did not, however, suggest that once the EPA approved the final permit, jurisdiction in the federal appellate courts existed pursuant to section 1369(b). To the contrary, the court stated that once the state amended the permit "a state court may review the action, including all of the antecedent decisions about the content of the B and C lists." Id. (emphasis added). Furthermore, the rationale underlying the Seventh Circuit's interpretation of section 1369 is not based on the finality of the EPA's decisions, but on the distinction the statute draws between approval and promulgation and the fact that in the case of ICSs, Congress intended federal courts to have jurisdiction only where the EPA itself promulgates the ICS.
 
 
 28
 In anticipation of such a conclusion, the petitioners argue that the EPA has effectively promulgated the ICS in question here. Section 1314(l )(3) states:
 
 
 29
 If a State fails to submit control strategies in accordance with paragraph (1) or the Administrator does not approve the control strategies submitted by such state in accordance with paragraph (1), then ... the Administrator, in cooperation with such State and after notice and opportunity for public comment, shall implement the requirements of paragraph (1) in such State....
 
 
 30
 33 U.S.C. § 1314(l )(3). The petitioners contend that once the states failed to submit timely ICSs, the EPA's duty to "implement" the paragraph requiring ICSs transforms the EPA's role from oversight to intervention and that any resulting ICS was therefore promulgated by the EPA, no matter who was actually responsible for developing the ICS.
 
 
 31
 The regulations, however, suggest that even where the EPA is required to implement section 1314(l )(1), the state retains the authority to issue the ICS in most circumstances. 40 C.F.R. § 123.46(f) states:
 
 
 32
 At any time after the Regional Administrator disapproves an ICS (or conditionally approves a draft permit as an ICS), the Regional Office may submit a written notification to the State that the Regional Office intends to issue the ICS. Upon mailing the notification, and notwithstanding any other regulation, exclusive authority to issue the permit passes to EPA.
 
 
 33
 "[O]nly upon mailing of this notification does such permit issuing authority pass to the EPA." P.H. Glatfelter Co. v. EPA, 921 F.2d 516, 517 (4th Cir.1990).
 
 
 34
 Furthermore, the mere fact that the EPA cooperates with a state in developing an ICS does not make the ICS an EPA promulgation. In Shell Oil, we held that even if a state's decision to issue or deny an NPDES permit was made pursuant to EPA instructions, the court of appeals did not have jurisdiction to review the decision because it was not an EPA action issuing or denying the permit, as required by section 1369(b)(1)(F). 585 F.2d at 411.
 
 
 35
 Our interpretation of the EPA's duty to implement the Act is consistent with the purpose of the Act to afford states as much control as possible over implementation and enforcement of pollution controls. See 33 U.S.C. § 1251(b). Maximizing state control also suggests that federal courts should review ICS decisions only when the ICS was actually developed by the EPA, leaving review of state-developed ICSs to state courts. See Roll Coater, 932 F.2d at 671 (Once the state develops a final NPDES permit as an ICS, "a state court may review the action."). This is precisely the system formalized by Congress in allowing federal review of ICS decisions only where the ICS is "promulgat[ed]" by the EPA. Cf. American Paper Institute, 890 F.2d at 874-75 (Under the Act, a final state-issued NPDES permit, although subject to EPA approval, is subject to judicial review in state court.).
 
 
 36
 In the present cases, the EPA satisfied its duty to implement section 1314(l ) by requiring the states to modify and complete the ICSs. The EPA did not demonstrate any intention to issue the ICSs itself or to rescind the states' authority to issue NPDES permits. This was a reasonable manner of implementing section 1314(l ) because the states had completed studies of their toxic problems and had already begun to develop permit requirements.
 
 
 37
 The petitioners further argue that if the EPA's approval of California's ICS is not reviewable in this court, there will be an irrational bifurcation of review between federal courts of appeals and district courts. This argument assumes that if federal courts of appeals do not have jurisdiction to review EPA action regarding ICSs under section 1369(b)(1), such action is reviewable in federal district court under the Administrative Procedure Act. See 5 U.S.C. § 702.[9]
 
 
 38
 Whether petitioners could seek review in federal district court under the Administrative Procedure Act is not before us. It may be, however, that such review is foreclosed by the existence of adequate state fora for review of the states' actions in creating and granting NPDES permits. See Shell Oil, 585 F.2d at 414; see also 5 U.S.C. § 701 (APA provisions apply except to the extent that statutes preclude judicial review); Roll Coater, 932 F.2d at 671 (EPA approval of ICS not reviewable pursuant to the APA because the Water Quality Act divides review "between the courts of appeals and state courts, not between the courts of appeals and the district courts"); cf. American Paper Institute, 890 F.2d at 875 (Congressional intent to place the regulatory burden on the states shows clear intent to preclude federal review of state-issued NPDES permits). If this is the case, any bifurcation that results when there exists a state forum for review of an ICS is consistent with Congress' goal of leaving with the states the primary responsibility for controlling water pollution: state courts will review state-promulgated ICSs and federal courts will review those promulgated by the EPA.
 
 
 39
 The bifurcation envisioned by the petitioners might occur if a state does not have any procedure for reviewing decisions regarding an ICS.[10] It is unclear, however, whether such a situation exists. It is also unclear how this limited potential for bifurcation in federal court would require us to disregard Congress' intent to ensure that States retain the primary responsibility in the restoration and maintenance of their waters. Any bifurcation problem is simply the logical consequence of the interrelationship of sections 1369(b)(1)(G) and 1342(d).
 
 
 40
 Petitioners' final argument is that state court review is inadequate because a state court cannot set aside an ICS that has been approved by EPA. Although state courts do not have the direct power to invalidate or to enjoin EPA's approval of an ICS, state courts can interpret federal law, and thus can review and enjoin state authorities from issuing permits that violate the requirements of the Clean Water Act. Any modifications of the permits would have to be approved by EPA, but the fact that EPA has the final decision-making authority in the issuance of an ICS does not mean that state judicial and administrative proceedings are inadequate for reviewing state created ICSs.
 
 IV
 
 41
 The petitions are DISMISSED for lack of jurisdiction. The EPA and the Santa Clara Valley Nonpoint Source Dischargers' request for attorney's fees in No. 91-70056 is DENIED. See 33 U.S.C. § 1369(b)(3) (fee awards to prevailing parties left to court's discretion).
 
 
 
 [1]
 The Santa Clara Valley Nonpoint Source Dischargers consists of the Santa Clara Valley Water District, the County of Santa Clara, the City of Campbell, the City of Cupertino, the City of Los Altos, the Town of Los Altos Hills, the Town of Los Gatos, the City of Milpitas, the City of Monte Sereno, the City of Mountain View, the City of Palo Alto, the City of San Jose, the City of Santa Clara, the City of Saratoga, and the City of Sunnyvale
 
 
 [2]
 The three mills are owned by the Boise Cascade Corporation, Pope & Talbot, Inc., and James River II, Inc. They will be referred to collectively as "the Mills."
 
 
 [3]
 The Coalition was joined in its petition by Columbia River United and Jay Sherred. The three petitioners will be jointly referred to as "the Coalition."
 
 
 [4]
 The Clean Water Act declares:
 It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use ... of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.
 33 U.S.C. § 1251(b); see also American Paper Institute, 890 F.2d 869, 873 n. 6 (7th Cir.1989) (quoting numerous similar expressions of congressional intent found in the legislative history of the Act).
 
 
 [5]
 A point source is "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14)
 
 
 [6]
 Where a state cannot submit a final permit, the ICS may be in the form of a draft permit. 40 C.F.R. § 123.46(c)
 
 
 [7]
 40 C.F.R. § 122.28 allows general NPDES permits to be issued to regulate categories of point sources that satisfy certain criteria
 
 
 [8]
 Section 1369(b)(1) provides for review in the federal courts of appeals of
 the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(1) of this title.
 33 U.S.C. § 1369(b)(1).
 
 
 [9]
 "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702
 
 
 [10]
 It appears that even states not authorized to issue NPDES permits, must develop and submit ICSs themselves, even though ICSs are to be developed in the form of NPDES permits. See 33 U.S.C. § 1314(l )(1) (lists of impaired waters and ICSs to be submitted by "each state"); 40 C.F.R. § 123.46(a), (c). In such a case, federal court review of the substance of the ICS might be possible. In such states, once the ICS is approved, the permit itself must be issued by the EPA. Section 1369(b)(1)(F) grants the courts of appeals jurisdiction to review EPA actions "in issuing or denying" NPDES permits. 33 U.S.C. § 1369(b)(1)(F). A challenge to the issuance of a permit on the ground that the ICS on which it was based was not properly developed would essentially be a challenge of the ICS itself