**MUNICIPAL AUTHORITY OF the BOROUGH OF ST. MARYS,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Respondent.

No. 91–3009.

United States Court of Appeals,
Third Circuit.

Argued July 10, 1991.

Decided Sept. 12, 1991.

Rehearing Denied Oct. 7, 1991.

Alan S. Miller (argued), Anthony P. Picadio, Picadio, McCall & Kane, Pittsburgh, Pa., for petitioner.

Jon M. Lipshultz (argued), U.S. Dept. of Justice, Environmental Defense Section, Land and Natural Resources Div., Washington, D.C., for respondent.

Before STAPLETON, HUTCHINSON and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

St. Marys petitions this court for review of the Environmental Protection Agency's ("EPA") decision to approve an individual control strategy issued by the Pennsylvania Department of Environmental Resources for the St. Mary's Publicly Owned Treatment Works, and also the EPA's decision to include Elk Creek on the list of polluted navigable waters subject to the requirements of the Clean Water Act's § 304(*l*) program. 33 U.S.C. § 1314(*l*). Because such actions do not constitute promulgation of an individual control strategy by the EPA within the meaning of 33 U.S.C. § 1369(b)(1)(G), we do not have jurisdiction over the case and must therefore dismiss the petition.

### I.

In order to ensure that states play the principal role in the abatement of water pollution in their own jurisdictions, the Clean Water Act allocates responsibilities between the states and the EPA. *See EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 207–09, 96 S.Ct. 2022, 2025–27, 48 L.Ed.2d 578 (1976); (describing the state and federal roles in implementing the National Pollutant Discharge Elimination System); *E.I. DuPont de Nemours & Co. v. Train*, 430 U.S. 112, 116–21, 97 S.Ct. 965, 968–72, 51 L.Ed.2d 204 (1977) (summarizing the statutory allocation of responsibilities within the Federal Water Pollution Control Act). The primary regulatory mechanism of the Clean Water Act is the prohibition of discharges of any pollutant from any point source unless that discharge complies with the Act's specific requirements. §§ 301(a), 502(12) Clean Water Act, 33 U.S.C. §§ 1311(a), 1362(12). This compliance is achieved by obtaining and adhering to the terms of a National Pollutant Discharge Elimination System ("NPDES") Permit. *See* § 402 Clean Water Act, 33 U.S.C. § 1342. While the EPA has the original authority to issue NPDES permits, Congress intended that the states should be granted the authority to issue such permits upon proper application to the EPA for such authorization. *See American Paper Inst. v. EPA*, 890 F.2d 869, 873 n. 6 (7th Cir.1989) (citing several instances in the legislative history of various amendments to the Clean Water Act indicating that Congress intended the states to play the leading role in implementing the NPDES program).

According to the EPA, it has, to date, granted 39 states, including Pennsylvania, the authority to issue NPDES permits. In authorized states, NPDES permits are issued by the appropriate state agency, subject to EPA objection. § 402(d) Clean Water Act, 33 U.S.C. § 1342(d). In Pennsylvania, the Department of Environmental Resources ("DER") is the appropriate state agency. A final state-issued permit is subject to judicial review in state court, with the state defending the permit decision and terms. *See American Paper Inst. v. EPA*, 890 F.2d at 874–75.

In 1987 Congress amended the Clean Water Act through passage of the Water Quality Act of 1987, Pub.L. No. 100–4, 101 Stat. 7 (1987). This amendment established the § 304(*l*) program, 33 U.S.C. § 1314(*l*), whose purpose is to identify and control "toxic hot spots." 133 Cong.Rec. 1287 (1987) (statement of Sen. Moynihan). Section 304(*l*) of the Clean Water Act mandates that states submit lists of polluted navigable waters and a list of dischargers of toxic pollutants to the EPA. Generally, the Act requires the states to submit the following: 1) the *"A"* or *"Long List"*—a list of all waters that, after the application of effluent limitations, cannot reasonably be anticipated to attain water quality for state designated uses due to toxic pollutants; 2) the *"B"* or *"Short List"*—a list of all navigable waters that, after application of federal and state effluent limitations, the state does not expect to meet the prescribed water quality standards due to listed point sources; 3) the *"C"* or *"Discharger List"*—a list of those point sources that are impairing the achievement of those water quality goals as well as the amount of pollutant each of those point

sources produces; and 4) the *"Mini List"*—a list of waters that cannot be anticipated to maintain water quality that will assure protection of public health, public water supply, agricultural and industrial uses, as well as, the protection of shellfish and recreational uses. *See* 33 U.S.C. § 1314(*l*).

Finally § 304(*l*) requires the states to submit an Individual Control Strategy ("ICS") for each point source (included on a "C List") which was discharging toxic pollutants into waters on a "B List." The ICS sets out discharge limitations that the state has determined will reduce point source discharges of toxic pollutants to meet water quality standards within three years after the date of the establishment of the ICS. 40 C.F.R. § 123.46(a); *see* 33 U.S.C. § 1314(*l*)(1)(D).

EPA defines an ICS to be a draft or final NPDES permit accompanied by supporting documentation showing that effluent limits are sufficient to meet applicable water quality standards. *See* 40 C.F.R. § 123.46(c); 54 Fed.Reg. at 23,888. In states with authorized NPDES programs, the program works as follows: pursuant to § 304(*l*)(2), EPA was to approve or disapprove the ICSs submitted by the states (due no later than February 4, 1989) within four months of those submissions (*i.e.*, by June 1989). If a state fails to submit any ICSs or fails to submit approvable ICSs, the EPA, "in cooperation with such State ... shall implement the requirements of" § 304(*l*)(1) in that state. 33 U.S.C. § 1314(*l*)(3). If EPA assumes authority for issuing the ICS, the deadline for developing ICSs is extended one year to June 1990. *Id.*

EPA reviews the state's submittal of lists and ICSs. 40 C.F.R. §§ 123.46(e), 130.10(d)(8) and (10). EPA may approve or disapprove a state's § 304(*l*) lists. EPA may disapprove the state's lists in whole or in part if the state fails to include certain water segments or pollution dischargers on those lists. If EPA disapproves the state's submittal, EPA, in cooperation with the state, must develop the lists by June 4, 1990. 40 C.F.R. § 130.10(d)(10); *Westvaco Corp. v. EPA*, 899 F.2d 1383, 1385 (4th Cir.1990).

Similarly, EPA may approve, conditionally approve, or disapprove a state-submitted ICS. 40 C.F.R. § 123.46(b). If a state is unable to issue a final permit on or before February 4, 1989, an ICS may be a draft permit with an attached schedule indicating that the permit will be issued on or before February 4, 1990. If the state's ICS submission is in the form of a draft NPDES permit, EPA will either conditionally approve or disapprove the ICS. If the state submits a final NPDES permit as the ICS, EPA will either approve or disapprove it as an ICS "sufficient ... to achieve the applicable water quality standard." § 304(*l*)(1)(D), 33 U.S.C. § 1314(*l*)(1)(D).

## II.

On February 3, 1989 the Pennsylvania DER sent the EPA its lists of polluted waters and dischargers. (App. at 162). At that time, St. Marys Publicly Owned Treatment Works ("St. Marys POTW" or "St. Marys") was not included on the "C" list (of point source dischargers); nor did DER submit an ICS for the facility.[1] In a letter dated May 12, 1989, EPA responded to DER's submission. EPA notified DER that the long list (the "A" list) was "complete with several exceptions," but the mini, short (the "B" list) and discharger lists (the "C" list) were "incomplete." (App. at 173). The letter concluded by stating that if the information necessary for draft ICSs could not be collected by the

---

1. According to the documents in St. Marys possession, Elk Creek was not listed on either the "A" list or the "B" list. According to EPA, St. Marys was provided with incomplete copies of the lists due to a clerical error. EPA has explained that Elk Creek was, in fact, included on the "A" list pursuant to § 304(*l*)(1)(A)(ii) and has provided supporting documentation in its supplemental appendix. (Supp.App. 31(s)).

Similarly, regarding the "B" list, which St. Marys contends did not list Elk Creek, EPA has now provided a complete copy of the list which does include Elk Creek. (Supp.App. at 16). In addition, EPA has offered documentation to show that Elk Creek was also listed on the mini list pursuant to § 304(*l*)(1)(A)(i). (Supp.App. at 10, 13).

June 4, 1989 deadline, EPA would recommend rejection of the state's ICSs. (App. at 175).

On May 30, 1989, DER submitted its revised lists, (App. at 178), which EPA approved on June 2, 1989. (App. at 189). The St. Marys POTW was not listed on the approved list although another discharger to Elk Creek, Ridgway Color Company was listed. (App. at 192). By letter dated June 2, 1989, EPA responded to DER's revised submissions. According to EPA, it "in essence, ... approved the lists submitted ... but disapproved Pennsylvania's failure to submit any appropriate ICSs for the facilities on the discharger list at that time." (App. at 189–90). EPA then prepared to finalize the lists. EPA states that it published notice of its ICS and listing decisions for public comment, and conducted a 120–day public comment period pursuant to § 304($l$)(3). *See* 40 C.F.R. § 130.10(d)(1) & (11) (authorizing Regional Administrators to solicit public comment and/or petitions on approvals and disapprovals, and directing the regions to respond to such comments or petitions no later than June 4, 1990). (App. at 191).

One of the comments received was from Ridgway Color Company. On October 4, 1989, Ridgway Color Company (a discharger located on Elk Creek approximately seven miles downstream from St. Marys) protested its inclusion on the "C" list, and, in arguing that it should be removed from the list, commented, "if metals [are] DER's concern then many dischargers especially in the area of St. Marys borough, should have been listed...." (App. at 210). In response to this comment, EPA began an investigation of other dischargers in the Elk Creek area, and determined that Elk Creek should be listed on both the "A" and "B" lists, (App. at 245–46) and that St. Marys should be on the "C" list. (App. at 258–59). In a letter dated May 23, 1990, EPA notified St. Marys that it would be listed on the discharger list and that an ICS would be developed for the POTW by the state. (App. at 270). Accordingly, DER

issued the ICS in the form of a draft NPDES permit on May 30, 1990. (App. at 314). On September 17, 1990, EPA gave its conditional approval to DER's listing of St. Marys.[2] This act constituted EPA's final act in the listing process. DER issued the final permit on September 25, 1990.

St. Marys has followed both state and federal avenues of appeal. St. Marys filed this action before the U.S. Court of Appeals pursuant to § 1369(b)(1) which provides,

"Review of the Administrator's action ... (G) in promulgating any individual control strategy under section 1314($l$) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business...."

33 U.S.C. § 1369(b)(1). Within Pennsylvania, St. Marys appealed the permit to the Environmental Hearing Board ("EHB"), the entity empowered to review DER actions, challenging the imposition of Water Quality Based Effluent Limits (WQBELs) for certain metals and the model which DER utilized to derive the WQBELs.

On May 24, 1991, DER and St. Marys agreed to settle the dispute regarding the NPDES permit—their agreement is set forth in a "Consent Adjudication". (Reply Br. at 26).

### III.

St. Marys seeks review of the EPA's decision to include the POTW and Elk Creek on the § 304($l$) list and the EPA's approval of the ICS for the St. Marys POTW. Their underlying concern is not that they think that they should not be subject to the effluent standards of the Clean Water Act but rather that they wish to avoid the costs associated with § 304($l$)'s requirement of compliance within three years (*i.e.* by 1993). Therefore, while St. Marys has negotiated and reached agreement with DER about modification of

---

**2.** EPA's approval was conditioned on DER's issuing a final permit by February 4, 1991. In addition, the letter made it clear that if the state did not comply with the conditions that EPA would revoke the state's permit issuing power and issue the ICS itself. (App. at 312).

the specific terms of the NPDES permit, they nonetheless seek to challenge EPA's decision to include them in the § 304(*l*) program.

This appeal raises the question of where and when a discharger may challenge the propriety of being included in a § 304(*l*) program. Although St. Marys urges that we follow the general principle which favors a liberal interpretation of statutes providing for judicial review of administrative action absent a persuasive demonstration that Congress intended otherwise, *see Modine Manufacturing Corp. v. Kay*, 791 F.2d 267, 269–70 (3d Cir.1986) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)), we find that a liberal interpretation of § 304(*l*) is not proper here, in light of the specific expression of Congressional intent that the states should be the primary regulators of the ICS program.

## IV.

The 1987 amendments to the Clean Water Act further evince Congress' intent to make the states, where possible, the primary regulators of the national pollution permit system.[3] Therefore, it has been held that the Act should be construed to "place maximum responsibility for permitting decisions on the states where the EPA has certified a NPDES permitting program." *American Paper v. U.S.E.P.A.*, 890 F.2d 869, 874 (7th Cir.1989). Accordingly, courts have generally denied federal judicial review of state-issued permits. *American Paper*, 890 F.2d at 874 (citing as examples, *District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir.1980); *Shell Oil Co. v. Train*, 585 F.2d 408 (9th Cir.1978); *Consolidated Edison Co. v. New York State Dep't of Envtl. Conservation*,

726 F.Supp. 1404 (S.D.N.Y.1989); *Natural Resources Defense Council v. Outboard Marine Corp.*, 702 F.Supp. 690 (N.D.Ill. 1988)).[4]

When Congress added the § 304(*l*) program to the Clean Water Act, it also added a subsection to the Act's judicial review provision. Section 509(b)(1)(G) allows federal courts of appeals to review the EPA Administrator's action in *promulgating* any individual control strategy under § 304(*l*). Although the term "promulgate" is not otherwise used in § 304(*l*) in connection with the ICS program, two courts of appeals have decided, in cases involving the ICS program, that EPA's conditional approval of a state-issued draft NPDES permit as an ICS and the decision to list a discharger does not constitute promulgation of an ICS.

In *P.H. Glatfelter Co. v. EPA*, 921 F.2d 516 (4th Cir.1990) the petitioners challenged 1) EPA's conditional approval of a draft NPDES permit submitted by North Carolina as an ICS for a paper mill that was discharging dioxin into a waterway; and 2) EPA's decision to include the waterway and the mill on the "B" and "C" lists. *See Glatfelter*, 921 F.2d at 517. The Fourth Circuit concluded that it lacked jurisdiction to consider the petition because EPA had not promulgated an ICS. The court concluded that EPA's approval of an ICS was merely a preliminary step in the permitting process.

Judicial review of these preliminary steps would require the entire administrative process of finding that limitations are necessary to meet water quality standards be conducted twice—once in the listing/ICS process and again in the permitting process. Review by this court at this preliminary stage would lead to piecemeal review and undermine future

---

**3.** The statute provides:
It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b).

**4.** In *American Paper*, the court noted, "[f]or us to find jurisdiction to review the state permits in this case would mean that Congress intended a most improbable and awkward division of the review of state-issued permits between state and federal tribunals." *Id.* (citing *Chesapeake Bay Found. v. Virginia State Water Control Bd.*, 495 F.Supp. 1229, 1237 (E.D.Va.1980)).

state administrative and judicial proceedings.... Indeed, the fact that Congress provided for review of the EPA's promulgation of an ICS under § 509(b)(1)(G) but made no provision for review of other EPA decisions under § 304(*l*) suggests that Congress intended such intermediate steps not be immediately reviewable. *Id.* at 518.

The court further observed that when EPA disapproves a state-developed ICS or conditionally approves a state's draft permit as an ICS, it may at any subsequent time submit a written notification to the state that it intends to issue the ICS and that permit issuing authority has, therefore, reverted to the EPA. *Id.* at 517. However, only upon mailing of this notification does such permit issuing authority pass to the EPA. *Id.* Unless EPA revoked North Carolina's permit issuing authority and issued the ICS itself, the court was without jurisdiction to review the decision. *See id.* at 518.

In *Roll Coater, Inc. v. Reilly,* 932 F.2d 668 (7th Cir.1991) the Seventh Circuit agreed with the Fourth Circuit that § 509(b)(1)(G) does not confer jurisdiction for review of challenges to EPA listing decisions or ICS approvals or disapprovals. In that case, the court held that jurisdiction under that provision exists only for the limited situation of where EPA actually issues an ICS pursuant to § 304(*l*)(3) *i.e.* when the EPA promulgates the ICS. The court stressed that absent such a situation, review was properly limited to state court proceedings when the ICS actually resulted in a modification of a discharger's NPDES permit. *See Roll Coater,* 932 F.2d at 671. The court also analyzed the meaning of the phrase "promulgate an ICS" and decided that the statute distinguished between approving a state-issued ICS under § 304(*l*)(2) and EPA's devising and issuing a federal ICS under § 304(*l*)(3). *Roll Coater,* 932 F.2d at 670. Only the latter constitutes actual EPA promulgation of an ICS.

St. Marys argues that *Glatfelter* and *Roll Coater* were wrongly decided because the courts misconstrued the meaning of final action within the context of the § 304(*l*) program. According to St. Marys, there is no functional difference between EPA's approval of an ICS in the form of a federally-issued NPDES permit as opposed to EPA's approval of an ICS in the form of a state-issued NPDES permit. Section 509(b)(1)(G) should be read as providing for review of a final decision on an ICS which includes EPA's approval of an ICS set forth in a state-issued NPDES permit.

Although there plausibly is some internal logic to this argument, the argument fails, nevertheless, when it is applied to the reality of the operation of the § 304(*l*). The unique state-federal interplay prescribed by the provision was intended by Congress to emphasize the ultimate primacy of the state's role. While the EPA's approval of the list and the ICS technically constitutes the federal agency's final act in administering the § 304(*l*) program, this is not the final act in the implementation and administration of the program's requirements. The actual parameters of the effluent limitations contained in a particular permit are subject to change during the permit modification process which continues at the state level. The events in this case are a testimony to this fact. As noted above, St. Marys and DER have already reached agreement, in the "Consent Adjudication", on various modifications to the permit in question. The terms of the settlement included *inter alia,* DER's agreement that more recent and complete information should be considered before effluent limits for copper and silver were finalized in the permit. (Reply Br. at 27). DER also agreed that it had inadvertently listed silver and dissolved iron as a parameter governed by § 304(*l*) of the Clean Water Act in the permit. St. Marys agreed to withdraw its challenge to the effluent limit for ammonia nitrogen. (*Id.* at 28). By the consent of the parties, DER also agreed to modify the NPDES permit to remove the WQBEL limitation for zinc, dissolved iron, and silver on or before March 1, 1992. (*Id.* at 28–9). Accordingly, the existence of permit modification process and the events which have taken place in this case amply demonstrate that EPA's involvement in the process is, in fact, preliminary and initial.

To provide judicial review at this stage would not only violate Congress' intent to provide review only where the EPA has promulgated the ICS but also would be inefficient and impractical as the final decision on the parameters of the final NPDES permit has yet to be made by the state.

V.

St. Marys further argues that interpreting § 1369(b)(1)(G) to allow review of only those permits issued by the EPA renders the provision a nullity because § 1369(b)(1)(F) already provides for review in the courts of appeals of EPA-issued NPDES permits. According to this argument, limiting review here to an ICS contained in an EPA NPDES permit would not grant any jurisdiction beyond that already conferred by § 1369(B)(1)(F). This argument assumes incorrectly, however, that an ICS will always be in the form of an NPDES permit. EPA points out that St. Marys has overlooked the fact that Congress gave EPA the discretion to determine what an ICS would consist of—and EPA, not Congress, has determined that an ICS can be in the form of an NPDES permit. *See* 40 C.F.R. § 123.46(c); 54 Fed.Reg. at 23,888. Therefore, St. Marys argument that Congress intended to allow federal court review of only EPA issued NPDES permits while allowing review of both state and EPA issued ICSs is unpersuasive. Rather, the only conclusion possible is that Congress was primarily concerned with insuring that review of a federally promulgated ICS would be obtained in the appropriate federal forum. In adding § 509(b)(1)(G), Congress intended to insure that review of EPA's promulgation of an ICS would be obtained in the courts of appeals as opposed to the district courts, just as review of an EPA issued NPDES permit is available in the courts of appeals.

St. Marys presents a separate argument regarding EPA's decision to list the POTW. It argues that construing § 509(b)(1)(G) to not provide review of the EPA's approval of an ICS contained in a state-issued permit effectively deprives St. Mary's of any review of whether it was properly brought within the ambit of the § 304(*l*) program. According to this argument, since listing was an EPA decision and the deadline for compliance with the § 304(*l*) program's requirements has no counterpart in the state regulatory program, St. Marys has no opportunity to seek review through the state administrative process.

While St. Marys is correct in pointing out that it will not be able to obtain immediate review of the EPA's decision to approve the listing of a particular facility within the § 304(*l*) program, our reasoning as to why it is not proper for this court to review the EPA approval of an ICS applies equally here. Review of this initial decision is not necessary because it is only a preliminary decision subject to change. The decision to include a particular facility on a list is made after a preliminary estimate of WQBEL levels. This decision does not cause any legal or practical hardship to a firm that cannot be addressed fairly and adequately at the permitting stage. For example, another discharger, Custom Industries Processing, was later removed from the list for copper after the company collected and presented data to DER showing that listing was unwarranted for that parameter. (App. at 245). Similarly, Ridgway Color Company was also deleted from the list for copper because its NPDES permit was reissued in September, 1989 establishing WQBELs with immediate compliance for the company's discharge of copper. (EPA Br. at 49–50). These examples demonstrate that the listing process serves to identify potential problems for study through the permitting process. As the decision to list is a preliminary decision and can in no way be considered to involve the EPA's promulgation of an ICS, this court is without jurisdiction to provide review.

We recognize that this system may present certain potential anomalies. In *Roll Coater*, the court observed:

> [t]o be sure it is unsettling to contemplate the prospect that neither the state nor an affected firm can have review in federal court when the EPA disapproves the state's lists and forces the state to come up with new ICSs, which it then approves. That situation—the one in

*Glatfelter*—could leave the firm asking the state court to set aside an order that the state's agency did not want to issue in the first place. No one would defend the EPA's decision, unless the EPA intervened. That is, however, a logical consequence of § 509(b)(1)(G).... *Roll Coater*, 932 F.2d at 671.

While we agree that it is of some concern that a permittee will not have review in the above circumstance, we are satisfied that this is the outcome dictated by Congress. We have no choice but to review only those decisions where EPA itself promulgates the ICS and we have no choice but to follow Congress' explicit mandate. As this is not a case where the EPA has promulgated an ICS, we are without jurisdiction to review St. Marys' petition.

## VI.

St. Marys argues further that review of the EPA's approval of an ICS should be in the court of appeals because the alternative would be a bifurcated system of review—appellate court review of an ICS contained in an EPA permit and district court review under the Administrative Procedures Act for ICSs contained in state-issued permits. According to St. Mary's,'this is in violation of the dictates of the Supreme Court's decision in *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980) (per curiam). St. Marys is mistaken that this case presents a choice between district court review and court of appeals review. Rather, the choice is state court review of state issued permits and federal court review of federally issued permits, as Congress intended.

St. Marys argues that *Crown Simpson* is an appropriate analog to this case and should provide guidance as to the proper outcome in this case. In that case, the Supreme Court held that a court of appeals had jurisdiction to hear a challenge to an EPA objection to a proposed state permit because the EPA's objection constituted a "denial" for purposes of 33 U.S.C. § 1369(b)(1)(F). The rationale was that an EPA objection was functionally similar to denying a proposed permit. Although the situation in *Crown Simpson* may upon a superficial reading appear analogous, we believe that the case is not, in fact, analogous. The *Crown Simpson* Court decided the point at which review was available within the federal court system. The Court explained that

"[w]hen EPA, as here, objects to effluent limitations contained in a state-issued permit, the precise effect of its action is to 'den[y]' a permit within the meaning of § 509(b)(1)(F). Under the contrary construction ... denials of NPDES permits would be reviewable at different levels of the federal court system depending on the fortuitous circumstance of whether the State in which the case arose was or was not authorized to issue permits." *Crown Simpson*, 100 S.Ct. at 1095.

In the case at hand, the question is whether Congress intended to afford federal or state court review of a state-issued ICS. The impetus for the Court's decision in *Crown Simpson*—that one type of agency action was functionally similar to another kind explicitly provided for in the statute—simply does not apply here. Accordingly, we conclude that *Crown Simpson* is not controlling on the facts presented in this appeal.

For the foregoing reasons, we hold that we are without jurisdiction to hear St. Marys petition for review. The petition for review will be dismissed.