954 F.2d 1218
 22 Envtl. L. Rep. 20,558
 LAKE CUMBERLAND TRUST, INC., Kentucky Chapters of Trout
Unlimited, Inc., League of Kentucky Sportsmen, Inc., the
Sierra Club, Pleasant Hill Community Association, Phillip
Heeren, Frank Elsen, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
The City of Jamestown, Kentucky, Union Underwear Company,
Inc., and the Commonwealth of Kentucky Natural
Resources and Environmental Protection
Cabinet, Intervenors.
 No. 90-3837.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 1, 1991.
Decided Jan. 27, 1992.
Order Modifying Opinion on Petition
for Rehearing April 10, 1992.
 
 Robert E. Reeves, Reeves & Graddy, Lexington, Ky., Todd E. Leatherman, W. Henry Graddy, IV (argued and briefed), Reeves & Graddy, Versaille, Ky., for petitioners.
 Martin F. McDermott (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Valdas V. Adamkus, Adm. EPA, U.S. E.P.A., Office of Regional Counsel, Region V, Chicago, Ill., William K. Reilly, Adm'r, Carol Ann Siciliano, U.S. E.P.A., Office of Gen. Counsel, Washington, D.C., Jacqueline F. Colson, U.S. E.P.A., Region IV, Atlanta, Ga., for respondent.
 
 
 1
 David A. Owen, John C. Bender, V. Thomas Fryman, Jr. (briefed), Lloyd R. Cress, Greenebaum, Doll & McDonald, Lexington, Ky., for intervenor City of Jamestown, Ky.
 
 
 2
 Edward F. Busch (briefed), Jack R. Underwood, Jr., Conliffe, Sandmann, Gorman & Sullivan, Louisville, Ky., for intervenor Underwear Com York Corp.
 
 
 3
 Dennis J. Conniff, Office of Gen. Counsel, Nat. Resources & Environmental Protection Cabinet, Kathryn M. Hargraves (briefed), Nat. Resources & Environmental Protection Cabinet, Office of Gen. Counsel, Frankfort, Ky., for intervenor Com. of Ky., Natural Resources and Environmental Protection Cabinet.
 
 
 4
 Before JONES, Circuit Judge, and ROSEN, District Judge.*
 
 
 5
 ROSEN, District Judge.
 
 
 6
 This case involves a petition for review under Section 509(b)(1) of the Clean Water Act, 33 U.S.C. § 1369(b)(1). Petitioners ask this Court to review the Environmental Protection Agency's ("EPA") approval of the Clean Water Act Section 304(1) individual control strategy ("ICS") issued by the Commonwealth of Kentucky's Natural Resources and Environmental Protection Cabinet (the "Kentucky Cabinet") for Jamestown, Kentucky's wastewater treatment plant and Big Lily Creek, a tributary of Lake Cumberland.
 
 
 7
 The ICS for the Jamestown wastewater treatment plant proposes to eliminate the wastewater plant's discharge of copper pollutants into Big Lily Creek by diverting the plant's discharge point via a pipeline that will carry the toxic effluents to the main body of Lake Cumberland where they will be diffused into that larger body of water. The EPA approved this individual control strategy in February 1990, and it is the EPA's approval of the ICS that Petitioners seek to overturn in this action.
 
 
 8
 Because we find that EPA approval does not constitute "promulgation" of an ICS within the meaning of 33 U.S.C. § 1369(b)(1)(G), we hold that this Court does not have jurisdiction over this case and, therefore, the petition must be dismissed.
 
 I. THE CLEAN WATER ACT
 
 9
 The Clean Water Act, 33 U.S.C. § 1251, et seq. (the "CWA"), prohibits the discharge of pollutants into designated waters unless the discharger complies with the Act's specific requirements. Dischargers may achieve compliance with the CWA by obtaining and adhering to the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. The EPA issues NPDES permits directly and also allows states to issue such permits, subject to approval by the EPA. In Kentucky, the National Resources and Environmental Protection Cabinet (the "Kentucky Cabinet") is the state agency authorized to issue NPDES permits.[1]
 
 
 10
 In 1987, Congress enacted the Water Quality Act, which established § 304(l ) of the CWA. § 304(l ) of the CWA, 33 U.S.C. § 1314(l ), as amended, pertains to bodies of water which, despite application of the Act's other provisions, still were not expected to meet water quality standards due to toxic pollution. Section 304(l ) requires every state to develop lists of impaired waters, to identify the point sources and the amount of the pollutants causing toxic impact, and to develop an individual control strategy ("ICS") for each point source.[2] The states submit the lists and ICSs to the EPA, and the EPA then either approves or disapproves them. Once the EPA approves an ICS, the state may then issue an NPDES permit.[3]
 
 
 11
 As the foregoing discussion indicates, Congress intended that the states play a leading role in clean water enforcement. In fact, the explicitly declared policy of the Clean Water Act itself provides that, as between the states and the federal government, the states are the principal actors in the abatement of water pollution:
 
 
 12
 It is the policy of Congress to recognize, preserve and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.
 
 
 13
 33 U.S.C. § 1251(b).
 
 II. FACTUAL BACKGROUND
 
 14
 The city of Jamestown, Kentucky, owns and operates the Russell County Regional Wastewater Treatment Plant. The plant handles wastewater from the Union Underwear Company textile manufacturing plant, which discharges high volumes of copper pollutants. The Russell County plant discharges its treated wastewater, including water from the Union Underwear Company, into Big Lily Creek.
 
 
 15
 As required by Section 304(l ), in February of 1989, the Kentucky Cabinet submitted two lists to EPA: (1) a list of water body segments in Kentucky which have impaired water quality and the pollutant causing the impairment (the " 'B' list") and (2) a list of the point sources causing the impairments along with the amount of the pollutants identified on the B list that each point source discharged to each listed waterbody segment (the " 'C' list"). The Cabinet also submitted a proposed individual control strategy for each source which was to reduce the discharge of the identified pollutants to the waterbody segments identified on the "B" list.
 
 
 16
 The Kentucky "B" list identified Big Lily Creek (a tributary of Lake Cumberland) as a waterbody segment impaired by the presence of copper. The "C" list identified the Jamestown/Russell County Publicly-Owned Wastewater Treatment Works (the "Jamestown POTW" or "JPOTW") as the responsible "point source" discharging 1.12 pounds per day of copper into Big Lily Creek.
 
 
 17
 The ICS for the Jamestown POTW was submitted to the EPA by the Kentucky Cabinet in the form of a draft KPDES permit to the City of Jamestown which provided for the elimination of the JPOTW's discharge of copper into Big Lily Creek by upgrading the water treatment plant, prohibiting industries that discharge into the plant from discharging pollutants, and relocating the JPOTW discharge point from Big Lily Creek to the main body of Lake Cumberland.[4]
 
 
 18
 The EPA approved the Kentucky Cabinet's Section 304(l ) lists and the initial draft of the KPDES permit, and after the close of the published period for input and comment on the draft KPDES--during which time two public hearings were held--the Kentucky Cabinet issued its final KPDES permit to the City. The EPA informed the Kentucky Cabinet by letter dated February 6, 1990 that the final KPDES permit for the Jamestown POTW was an acceptable individual control strategy.
 
 
 19
 On February 20, 1990, the EPA published notice of its final approval and disapproval of individual control strategies for Kentucky. The ICS for the Jamestown POTW was among those approved by the EPA. On September 25, 1990, Petitioners filed the instant Petition for Review, asking this Court to review and overrule the EPA's approval of the Jamestown POTW ICS.[5]
 
 
 20
 The EPA and the City of Jamestown filed motions to dismiss this Petition for lack of jurisdiction on the grounds that the Clean Water Act does not provide for federal judicial review of EPA approvals of state-developed ICS's.
 
 III. DISCUSSION
 
 21
 Section 509(b)(1) of the CWA, 33 U.S.C. § 1369(b)(1), sets forth the provisions regarding review of EPA actions. Subsection (G) of that section provides in pertinent part:
 
 
 22
 Review of the [EPA] Administrator's action ... in promulgating any individual control strategy under section 1314(l) of this title [section 304(l) of the CWA] may be had by any interested person in the Circuit Court of Appeals of the United States for the judicial district in which such person resides or transacts business ... upon application by such person....
 
 
 23
 33 U.S.C. § 1369(b)(1)(G).
 
 
 24
 The EPA and the Intervenors' position in this case is that EPA approvals of state-issued individual control strategies are not "promulgations" within the meaning of Section 509(b)(1)(G). They contend that only EPA-issued ICSs are reviewable under this section. The Courts of Appeals of four circuits--the Third, Fourth, Seventh and Ninth Circuits--have directly addressed this issue and all four of them agree with the EPA and Intervenors: The federal Circuit Courts of Appeals do not have jurisdiction to review EPA approvals of state-issued ICSs.[6] The Fifth Circuit has also reached the same conclusion in a case involving the issue of state-issued versus EPA-issued NPDESs.[7]
 
 
 25
 As noted supra, one of the explicitly stated policies of the Clean Water Act is to "recognize, preserve, and protect the primary responsibilities and rights of States" in the restoration and maintenance of their waters and in application of the Act. See, 33 U.S.C. § 1251(b). As the Ninth Circuit observed in Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427 (9th Cir.1991), this policy is further evident in the requirements of Section 304(1) added by the Water Quality Act of 1987, that the states identify navigable waters affected by toxic pollutants and develop strategies for cleaning them. 942 F.2d at 1429.
 
 
 26
 The federal-state relationship established by the Act is also illustrated in Congress' goal of encouraging states to "assume the major role in the operation of the NPDES program." Id. at 1430, quoting, Shell Oil Co. v. Train, 585 F.2d 408, 410 (9th Cir.1978). See also, 33 U.S.C. § 1342(b), (d) (authorizing the Administrator of the EPA to delegate to individual states the authority to issue NPDES permits themselves, subject to EPA objection.) When a state has been granted such authority, the EPA must suspend its own authority to issue permits until the Administrator determines that the state is no longer capable of issuing permits and notifies the state that the state's authority to do so is being withdrawn. Boise Cascade, supra, 942 F.2d at 1430. The result is "a system for mandatory approval of a conforming State program [which] creates a separate and independent State authority to administer the NPDES pollution control." Id., quoting, Shell Oil Co. v. Train, supra, 585 F.2d at 410.
 
 
 27
 Turning then to the decisions of the four Circuits that have specifically held that they have no jurisdiction to review EPA approvals of state-issued ICSs, in Boise Cascade, supra, a coalition of citizens groups filed a Petition for Review in the Ninth Circuit Court of Appeals of the EPA's approval of an NPDES issued by the State of California and submitted to the EPA as California's ICS for storm-drain discharge into San Francisco Bay.[8] The EPA argued--just as it does in this case--that the court did not have jurisdiction to review its approval of the California [and Oregon] ICSs because such approval does not constitute "promulgation".
 
 
 28
 In reaching its decision in Boise Cascade, the Ninth Circuit analyzed the review provisions of the Clean Water Act:
 
 
 29
 Section 1369(b)(1) specifically grants courts of appeals jurisdiction to review only certain EPA actions taken with respect to each of the requirements of the Act.[9] The section distinguishes between EPA approvals, determinations and promulgations. Such specificity demonstrates that Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act. See Bethlehem Steel Corp. v. EPA, 538 F.2d 513, 517 (2d Cir.1976) ("[t]he complexity and specificity of section [1369(b)(1) ] in identifying what actions of EPA under the [Clean Water Act] would be reviewable in the courts of appeals suggests that not all such actions are so reviewable.")
 
 
 30
 Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous. See Sutherland Stat.Const. §§ 46.05, 46.04 (4th ed. 1984); see also Aluminum Co. of America v. Bonneville Power Admin., 891 F.2d 748, 755 (9th Cir.1989). We must presume that words used more than once in the same statute have the same meaning. See Sutherland § 46.06.
 
 
 31
 We hold that for purposes of section 1369(b)(1), "promulgation" is not the same as "approval." The difference between subsection (G) and subsection (E), which provides for review of EPA decisions "approving or promulgating" effluent limitations, 33 U.S.C. § 1369(b)(1)(E), compels this conclusion. See United Technologies Corp. v. OSHA, 836 F.2d 52, 53 (2d Cir.1987) (The use of different words in the same sentence of a statute signals that Congress intended to distinguish between them.). To fail to distinguish between "promulgation" and "approval" would either result in a conflict between subsections (E) and (G) or would make superfluous the use of "approval" in subsection (E). We conclude, therefore, that Congress did not consider EPA approval of ICSs to be "promulgation" for the purpose of judicial review pursuant to subsection (G).
 
 
 32
 942 F.2d at 1431-1432 (emphasis added).
 
 
 33
 The Seventh Circuit reached the same conclusion in Roll Coater, Inc. v. Reilly, 932 F.2d 668 (7th Cir.1991):
 
 
 34
 Subsection (E) authorizes review of a decision "approving or promulgating any effluent limitation" under certain sections, the very distinction the EPA asks us to draw under subsection (G). Other subsections reinforce this reading. Subsections (B) and (D) create jurisdiction to review "any determination pursuant to" a named statute. Three more subsections--(A) and (C), in addition to (G)--limit review to the EPA's "promulgating" something. Subsection (A) refers to a "standard of performance" under § 306, 33 U.S.C. § 1316, and subsection (C) to an "effluent standard, prohibition, or pretreatment standard" under § 307, 33 U.S.C. § 1317. All of the items in (A) and (C) are things the Administrator does on his own. Subsections (B) and (D) treat "determinations" as something different from promulgation, implying that the EPA does not "promulgate" everything it issues or approves.
 
 932 F.2d at 670.[10]
 
 35
 The most recent decision on this issue is the Third Circuit's September 12, 1991 decision in Municipal Authority of the Borough of St. Marys v. U.S.E.P.A., 945 F.2d 67 (3rd Cir.1991). In deciding that case, the St. Marys court relied on Roll Coater, supra, on the Fourth Circuit's decision in P.H. Glatfelter Co. v. U.S. E.P.A., 921 F.2d 516 (4th Cir.1990),[11] and on the state versus federal mandates of the Clean Water Act. As in this case, the EPA argued in St. Marys that the court of appeals had no jurisdiction over the petition for review of the EPA's approval of an ICS issued by the Pennsylvania Department of Natural Resources for the St. Marys water treatment plant because the ICS was "promulgated" by the state agency rather than by EPA.
 
 
 36
 The St. Marys petitioners argued that there was no functional difference between the EPA's approval of state-issued NPDES and the EPA's own issuance of an NPDES and, therefore, Section 509(b)(1)(G) of the CWA, 33 U.S.C. § 1369(b)(1)(G), should be read as providing for review of a final decision on an ICS which includes EPA's approval of an ICS set forth in a state-issued NPDES permit. Although the Fourth Circuit noted that "there is plausibly some internal logic to this argument," it held that the argument failed because it found that "[t]he unique state-federal interplay prescribed by [the CWA]" established Congress' intent "to emphasize the ultimate primacy of the state's role." 945 F.2d at 72.[12]
 
 
 37
 We agree with the reasoning of our colleagues of the Third, Fourth, Seventh and Ninth Circuits and hold that the EPA's decision to approve a state-issued individual control strategy--such as the ICS issued by the Kentucky Cabinet in this case--is not an EPA "promulgation" within the meaning of Clean Water Act Section 509(b)(1)(G). Accordingly, we determine that we are without jurisdiction to hear Petitioners' petition for review.
 
 IV. CONCLUSION
 
 38
 Having determined that the ICS issued by the Kentucky Cabinet is not an EPA "promulgation" and having, therefore, further found that this Court lacks jurisdiction to hear the instant petition for review, this action is hereby DISMISSED.
 
 ORDER
 
 39
 April 10, 1992.
 
 
 40
 The Commonwealth of Kentucky, National Resources and Environmental Protection Cabinet ("Cabinet"), intervenor in the above-captioned matter, has filed a petition for rehearing with this Court. The Cabinet argues that the opinion filed in this matter on January 27, 1992 contains a statement which incorrectly interprets a Cabinet administrative regulation, 401 KAR 5:029, Section 5 (1985, 1990). The statement, located at page 1220 n. 4, reads: "Water quality standards for protection of aquatic life do not apply within the mixing zone but rather must be met at the edge of the MZ [mixing zone]."
 
 
 41
 Upon review, we find that the quoted statement does misconstrue the Cabinet's regulation, which provides for water quality standards both within and at the edge of the mixing zone. Because the sentence is unnecessary to the Court's decision on the merits, we hereby grant the Cabinet's request that the language be deleted from the opinion.
 
 
 42
 It is therefore ORDERED that the Lake Cumberland opinion be modified to delete the above language.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Being state issued permits, Kentucky's permits are colloquially referred to as "KPDES" permits instead of NPDES permits
 
 
 [2]
 Subsection 1 of Section 304(l ) of the CWA, as amended, provides as follows:
 (l ) Individual control strategies for toxic pollutants
 (1) State list of navigable waters and development of strategies
 Not later than 2 years after February 4, 1987, each State shall submit to the Administrator for review, approval, and implementation under this subsection--
 (A) a list of those waters within the State which after the application of effluent limitations required under section 1311(b)(2) of this title cannot reasonably be anticipated to attain or maintain (i) water quality standards for such waters reviewed, revised, or adopted in accordance with section 1313(c)(2)(B) of this title, due to toxic pollutants, or (ii) that water quality which shall assure protection of public health, public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shell fish, fish and wildlife, and allow recreational activities in and on the water;
 (B) a list of all navigable waters in such State for which the State does not expect the applicable standard under section 1313 of this title will be achieved after the requirements of sections 1311(b), 1316, and 1317(b) of this title are met, due entirely or substantially to discharges from point sources of any toxic pollutants listed pursuant to section 1317(a) of this title;
 (C) for each segment of navigable water included on such lists, a determination of the specific point sources discharging any such toxic pollutant which is believed to be preventing or impairing such water quality and the amount of each such toxic pollutant discharged by each such source; and
 (D) for each such segment, an individual control strategy which the State determines will produce a reduction in the discharge of toxic pollutants from point sources identified by the State under this paragraph through the establishment of effluent limitations under section 1342 of this title and water quality standards under section 1313(c)(2)(B) of this title, which reduction is sufficient, in combination with existing controls on point and nonpoint sources of pollution, to achieve the applicable water quality standard as soon as possible, but not later than 3 years after the date of the establishment of such strategy.
 The "lists" of impaired waters and point sources discharging toxic pollutants which the states were required to submit to the EPA by February 1989 are colloquially referred to by the letter subsection of the statute, i.e., the "A" list, the "B" list, the "C" list, etc.
 
 
 [3]
 ICSs are frequently submitted by the states in the form of "draft NPDESs", which, in fact, was the form of the ICS submitted by Kentucky that is at issue in this case
 
 
 [4]
 Lake Cumberland is an Army Corps of Engineers flood control and hydropower project formed in 1951 by Wolf Creek Dam on the Cumberland River. The ICS proposed relocating the Jamestown POTW discharge point by use of an overland pipeline to transport the wastewater plant's effluent to a submerged point within the main body of Lake Cumberland to which a diffuser would be attached to disperse the copper pollutants rapidly so that they would not harm aquatic life or affect the recreational use of the Lake and maintain acceptable water quality standards outside of the "mixing zone (MZ)". (A mixing zone is the zone in a body of water where wastewater and receiving water mix. Kentucky has had an EPA-approved mixing zone regulation in effect since 1985.) The Army Corps of Engineers performed an Environmental Assessment pursuant to the National Environmental Policy Act which examined the effects of the POTW discharge under the KPDES on water quality in and downstream of Lake Cumberland. The Army Corps found that "All water quality standards will be met outside of the initial mixing zone."
 
 
 [5]
 In addition to challenging the EPA's approval of the ICS in this Court, Petitioners are appealing the Kentucky Cabinet's issuance of the KPDES in a state administrative appeal proceeding. Petitioners have also filed a Citizen's Suit under 33 U.S.C. § 1365 in the federal district court for the Western District of Kentucky based on alleged ongoing violations of the Clean Water Act by the Jamestown wastewater treatment plant. In a fourth action, construction to update the plant has been enjoined by the federal district court while the court determines whether the City of Jamestown failed to assess the environmental impact of the water treatment plant's discharge
 
 
 [6]
 See, Municipal Authority of the Borough of St. Marys v. U.S. E.P.A., 945 F.2d 67 (3rd Cir.1991); P.H. Glatfelter Co. v. U.S. E.P.A., 921 F.2d 516 (4th Cir.1990); Roll Coater, Inc. v. Reilly, 932 F.2d 668 (7th Cir.1991); and Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427 (9th Cir.1991)
 
 
 [7]
 See, Save the Bay v. Administrator of E.P.A., 556 F.2d 1282 (5th Cir.1977). Just as Section 509(b)(1)(G) of the Clean Water Act provides for review of EPA-"promulgated" ICSs, Section 509(b)(1)(F) provides for review of the EPA's "issuance" of, or "refusal to issue", an NPDES permit
 
 
 [8]
 The California ICS review petition was consolidated for decision by the Ninth Circuit with another petition for review filed by two paper mills in Oregon who objected to an EPA-approved ICS which had been issued by the Oregon Department of Environmental Quality and which targeted the mills' discharge of pollutants for clean-up
 
 
 [9]
 The full text of Section 1369(b)(1) is as follows:
 Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (b) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition or pretreatment standard under section 1317 of this title, (D) in making any determination a to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(1) of this title.
 33 U.S.C. § 1369(b)(1).
 
 
 [10]
 Petitioners here argue--just as the Boise Cascade petitioners argued in that case--that Roll Coater should be distinguished because that case involved only the EPA's conditional approval of a draft NPDES permit. They want this Court to believe that the Roll Coater's finding of lack of jurisdiction was based upon a determination that the conditional approval was not a "final decision" subject to judicial review
 As the Boise Cascade court noted in addressing this very argument in that case,
 The Roll Coater court stated that "[u]ntil the state amends Roll Coater's permit to incorporate the terms of the ICS, there is no review anywhere." The court did not, however, suggest that once the EPA approved the final permit, jurisdiction in the federal appellate courts existed pursuant to section 1369(b). To the contrary, the court stated that once the state amended the permit "a state court may review the action, including all of the antecedent decisions about the content of the B and C lists." Furthermore, the rationale underlying the Seventh Circuit's interpretation of section 1369 is not based on the finality of the EPA's decisions, but on the distinction the statute draws between approval and promulgation and the fact that in the case of ICSs, Congress intended federal courts to have jurisdiction only where the EPA itself promulgates the ICS.
 942 F.2d at 1432-1433.
 
 
 [11]
 In Glatfelter, the Fourth Circuit held that it lacked jurisdiction to consider a petition challenging the EPA's conditional approval of a draft NPDES permit submitted by North Carolina as its ICS for a paper mill that was discharging dioxin in a waterway because the EPA had not promulgated the ICS. In reaching that decision, the court observed that when EPA disapproves a state-developed ICS or conditionally approves a state's draft permit as an ICS, it may at any time thereafter notify the state that it intends to issue the ICS itself and that permit issuing authority has, therefore reverted to the EPA. However, as the Glatfelter court noted, it is only upon mailing of such a notification that such permit issuing authority passes to the EPA. Because the EPA did not notify North Carolina in writing that ICS issuing authority had reverted to the EPA, nor did it attempt to issue a final permit for the paper mill, the Fourth Circuit concluded that "the EPA had not promulgated anything." 921 F.2d at 517-518
 
 
 [12]
 See also, Save the Bay v. Administrator of E.P.A., 556 F.2d 1282 (5th Cir.1977). In that case, the petitioner challenged the EPA's failure to veto a state-issued permit which allegedly violated CWA standards. Because EPA's failure to veto led indirectly to issuance of the state permit, the petitioner argued that § 509(b)(1)(F) conferred jurisdiction in the court of appeals. The Fifth Circuit rejected this argument, noting that the legislative history of the Act suggested that the Administrator's exercise of his "supervisory review" over proposed permits forwarded by the state programs is distinct from "issuance" of the permits, which is left to the states. Id. at 1291